IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

BRUCE RICHARD FRIEDMAN,　　　）　　　　CASE NO.:  8:16-CV-258
　　　　　　　　　　　　　　　　）
　　　　　　Plaintiff,　　　　　　）
　　　　　　　　　　　　　　　　）
　　v.　　　　　　　　　　　　　　）　　**DEFENDANT'S BRIEF IN SUPPORT**
　　　　　　　　　　　　　　　　）　　**OF MOTION FOR PARTIAL**
NATIONAL INDEMNITY COMPANY,　　）　　**SUMMARY JUDGMENT**
　　　　　　　　　　　　　　　　）
　　　　　　Defendant.　　　　　　）

COMES NOW Defendant, National Indemnity Company ("National Indemnity," "Company," or "NICO"), and, pursuant to the Court's March 21, 2017, Order (Filing 57), Fed. R. Civ. P. 56, and NECivR 56.1, submits this Brief in Support of Defendant's Motion for Partial Summary Judgment. The Plaintiff's overtime claim under the Fair Labor Standards Act ("FLSA") should be dismissed because there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law.

## I.　　INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff Bruce Friedman ("Plaintiff" or "Friedman") alleges that National Indemnity owes him unpaid overtime compensation because it improperly classified him as an exempt employee in violation of the FLSA. However, the undisputed facts demonstrate that National Indemnity properly classified Friedman as exempt under the FLSA's computer employee, administrative, and combination exemptions.

Friedman was hired because he was an expert on several technologies. He holds advanced technical certifications which reflect his high level of competence and expertise. Friedman was responsible for designing and engineering the Company's Data Center, network and storage systems, and other essential technology. Friedman met with NICO's vendors and prospective vendors to gather information to assist him in analyzing which technologies were best suited to design the Company's new Data Center and to update the Company's data storage capacity. Based on the breadth and depth of his technical expertise and knowledge, Friedman made recommendations to Company officials on the technologies vital to National Indemnity's business. He also assisted in resolving the most complex and difficult problems the Company faced

related to its network and storage systems by analyzing complex issues, engaging in testing and root cause analysis, and developing solutions.

Friedman exercised discretion and independent judgment to identify solutions to networking and storage problems, and the undisputed facts, as reflected in Friedman's pre-litigation communications, show that Friedman performed sophisticated work in creating National Indemnity's Data Center and in managing its network and storage systems and claimed credit and responsibility for such work.

Friedman's transparent attempts to downplay the significance of his role and re-characterize his job duties to suit his purposes in this lawsuit do not create a question of material fact for the jury. That Friedman may have performed some physical work directly and closely related to his network and storage engineering duties, such as cabling and moving equipment, does not diminish the significance of his position. Further, although Friedman downplays the significance of his role by focusing primarily on physical activities in his deposition, Friedman's communications while he was employed reflect the sophisticated and exempt nature of Friedman's work. This Court, like other courts have done, should reject Friedman's attempt to diminish his job duties and responsibilities and compare himself to lesser-skilled employees. This is especially true because Friedman's testimony and pre-litigation documents prove his current effort to downplay the nature of his work to be contrary to the facts. Accordingly, and as set forth fully below, National Indemnity is entitled to summary judgment and Plaintiff's FLSA overtime claim should be dismissed with prejudice.

## II.    SUMMARY JUDGMENT EXHIBITS

S.J. Ex. 1    Affidavit of Patrick J. Barrett dated September 15, 2017.

S.J. Ex. 2    Deposition of Plaintiff Bruce Friedman, taken August 9, 2017 (authenticated by S.J. Ex. 1).

S.J. Ex. 3    Deposition of Brian Chirhart, taken August 10, 2017 (authenticated by S.J. Ex. 1).

S.J. Ex. 4    Deposition of Dennis Halloran, taken August 14, 2017 (authenticated by S.J. Ex. 1).

S.J. Ex. 5    Transcript Produced by Plaintiff of May 27, 2016, Meeting

(authenticated by S.J. Ex. 1).[1]

S.J. Ex. 6    Plaintiff's Responses to Defendant's Requests for Admission (authenticated by S.J. Ex. 1).

S.J. Ex. 7    Plaintiff's LinkedIn Profile (BRF00153-00157) (authenticated by S.J. Ex. 1).

S.J. Ex. 8    Affidavit of Dennis Halloran dated September 15, 2017.

S.J. Ex. 9    Affidavit of Chris Lehr dated September 15, 2017.

S.J. Ex. 10    Plaintiff's E-mail Correspondence (authenticated by S.J. Ex. 9).

S.J. Ex. 11    Affidavit of Karen Rainwater dated September 15, 2017.

S.J. Ex. 12    Plaintiff's Application and Resume (authenticated by S.J. Ex. 11).

S.J. Ex. 13    IT Senior Systems/Software Engineer Job Description (authenticated by S.J. Ex. 11).

S.J. Ex. 14    Affidavit of Brian Chirhart dated September 15, 2017.

S.J. Ex. 15    Audio recording of May 27, 2016, Meeting (authenticated by S.J. Ex. 14).

S.J. Ex. 16    *Friedman v. Friedman*, Case No. 10DR2139, District Court of the Second Judicial District of the State of Colorado, City and County of Denver, Judge Ann B. Frick, Permanent Order dated October 26, 2011 (the "Colorado Order").[2]

## III.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS

### A.    National Indemnity's Business

---

[1] In discovery, Plaintiff produced a transcript ("Transcript") of an audio recording of a meeting between Plaintiff, Brian Chirhart, and Dennis Halloran. The audio recording has been authenticated by Brian Chirhart, who created the recording, in S.J. Exhibit 14 and is offered in support of Defendant's Motion for Partial Summary Judgment as S.J. Exhibit 15. *See* Fed. R. Civ. P. 56(c)(1)(A). The audio recording is more than an hour long. Defendant has offered the Transcript produced by Plaintiff simply to assist the Court in its review of the pertinent portions of the audio recording. The recording itself is admissible and can be heard by the Court and Plaintiff, and, as such, the Court may consider the evidence contained in the audio recording. *See* Fed. R. Civ. P. 56(c)(1)(A).

[2] Defendant requests that the Court take judicial notice of the Permanent Order in *Friedman v. Friedman*, Case No. 10DR2139, the District Court of the Second Judicial District of the State of Colorado, City and County of Denver, Judge Ann B. Frick, dated October 26, 2011 (the "Colorado Order"), and attached to the Index of Evidence as S.J. Exhibit 16.   The Colorado Order was also filed in the District Court of Douglas County, Nebraska on May 7, 2014, in Case No. CI 14-3716. *See Mehner Family Tr. v. U.S. Bank Nat'l Ass'n*, No. 8:16CV367, 2017 U.S. Dist. LEXIS 28876, at *4-5 (D. Neb. Mar. 1, 2017); Fed. R. Evid. 201.

1.     National Indemnity is a property/casualty insurer with its principal place of business in Omaha, Nebraska. (S.J. Ex. 8, Affidavit of Dennis Halloran ("Halloran Aff."), ¶3). National Indemnity employs 590 people and its Net Written Statutory Premium volume was $18.4 billion in 2015, $20.0 billion in 2016 and $11.2 billion in the first six months of 2017.  (S.J. Ex. 11, Affidavit of Karen Rainwater ("Rainwater Aff."), ¶3).

2.     In the second half of calendar year 2014, as part of its move from its location on Harney Street (the "Midtown Campus") to a new facility at 1314 Douglas Street ("1314 Douglas"), National Indemnity needed to build a new Data Center (the "Data Center"). (Halloran Aff. ¶4; S.J. Ex. 4, Deposition of Dennis Halloran ("Halloran Depo.") 14:23-24).

3.     Dennis Halloran, National Indemnity's IT Director, determined that the move to 1314 Douglas and building the Data Center would require several tasks, including:

a.     Research, evaluation, and recommendations around the core network which would reside in the Data Center and provide the connectivity between the Data Center, the rest of 1314 Douglas, and the greater network outside 1314 Douglas, which included a number of locations throughout the country. (Halloran Aff. ¶5.a).

b.     Research, evaluation, and recommendations about the physical security of the Data Center, the electrical and mechanical equipment and technologies, and how to integrate them to optimize redundancy,[3] operability, and cost. (Halloran Aff. ¶5.b).

c.     Re-architecting and implementing new network topologies[4] including a new WAN (Wide Area Network) topology to connect 1314 Douglas to the necessary parts of the outside world. (Halloran Aff. ¶5.c).

d.     Developing and establishing a campus network topology connecting the Midtown Campus to 1314 Douglas with enough capacity and redundancy to enable data communications during the migration of the business to 1314

---

[3] One example of redundancy is the concept of having two (2) power sources connected to each device so that if one (1) power source fails, the second power source is still supporting the device and the device will not fail. (Halloran Aff. ¶5.b).
[4] The network topology refers to "the way things interconnect, everything from phones and mobile devices, to computers, and servers, and storage, and the Internet, and printers." (S.J. Ex. 2, Plf. Depo. 119:1-6).

Douglas and to enable the migration of the technology infrastructure and platforms to the Data Center in 1314 Douglas. (Halloran Aff. ¶5.d).

      e.    Developing and establishing a data migration strategy to move all Company data to 1314 Douglas. (Halloran Aff. ¶5.e).

      f.    Ensuring adequate capacity for the intra-building network architecture, throughput, and redundancy to support data communications within 1314 Douglas. (Halloran Aff. ¶5.f).

      g.    Upgrading and revamping the Windows domain controller[5] architecture to be more compatible with the new network architecture. (Halloran Aff. ¶5.g).

      h.    Re-architecting, selecting, and implementing new data storage and data backup technologies, which included identifying, selecting, and implementing faster disc storage and identifying, selecting, and implementing a replacement for the aging EMC SAN (Storage Area Network) that was operating out of the Midtown Campus. (Halloran Aff. ¶5.h).

      i.    Identifying, selecting, and implementing a data backup solution which would take advantage of newer technologies and ultimately replace the two existing backup solutions in place. (Halloran Aff. ¶5.i).

      j.    Consideration of how these network, storage, and Data Center solutions would fit into a future disaster recovery strategy to be implemented after the completion of the migration to 1314 Douglas. (Halloran Aff. ¶5.j).

      4.    In order to accomplish this project, the Company approved a new position for an IT Senior Systems/Software Engineer. (Halloran Aff. ¶6).

      5.    The objectives for the new IT Senior Systems/Software Engineer included architecting, designing, and implementing a new network topology and a new storage topology inside the Data Center. (Halloran Aff. ¶16).

      6.    At the time the new IT Senior Systems/Software Engineer was hired, the two existing IT Senior Systems/Software Engineers reported to Brian Finken, the Information Systems Manager. However, because Halloran believed the new position

---

[5] The Windows domain controller manages rights and authentication on servers within its domain. (Halloran Aff. ¶5.g).

would play such a significant role in designing the Data Center, he assigned the new IT Senior Systems/Software Engineer position to report directly to him.[6] (Halloran Aff. ¶16).

## B.   Friedman's Application and Interview Process

7.   The Company interviewed Friedman for employment as the new IT Senior Systems/Software Engineer. (Halloran Aff. ¶7).

8.   On his application, Friedman touted several certifications he held, including Microsoft Certified Systems Engineer, Microsoft Certified Information Technology Professional, and Cisco Certified Network Associate. (Plf. Depo. 85:12-18; 85:25-86:4; 86:13-14; S.J. Ex. 12 at Friedman/National Indemnity 00046-00050).

9.   Before his NICO employment, Friedman had described himself, under oath, as one of the few people in the country who was a "Platinum Certified" Microsoft software technician and as a computer systems architect doing "very skilled work." (Ex. 16, Colorado Order).

10.   When he applied at NICO, Friedman's resume included prior experience in network engineering roles and identified several technologies with which Friedman was familiar. (S.J. Ex. 12 at Friedman/National Indemnity 00051-00052).

11.   During Friedman's interview, Halloran explained the duties Friedman would perform with respect to the planning of the Data Center, as well as the duties he would perform as outlined in Paragraph 3, above. (Halloran Aff. ¶8). The items Halloran discussed with Friedman included:

a.   Relocating the existing data center and building the new Data Center. (Halloran Aff. ¶8.a).

b.   Revamping the Omaha-based network topology and potentially re-thinking how the Omaha-based network topology would interface with the rest of the world. (Halloran Aff. ¶8.b).

c.   Increasing virtualization by building new virtualization host platforms and migrating physical server images into virtual guests. (Halloran Aff. ¶8.c).

---

[6] When Brian Chirhart was hired in February 2016 as IT Manager, supervision over that IT Senior Systems/Software Engineer role was transferred to Chirhart, who became the direct supervisor over Friedman, who was in the IT Senior Systems/Software Engineer role at that time. (Halloran Aff. ¶17).

d.      Replacing the disk storage (Storage Area Network ("SAN")) unit and re-migrating 100 terabytes of data, including facilitating the bandwidth necessary to do so. (Halloran Aff. ¶8.d).

e.      Re-thinking the Company's entire back-up strategy, which was, at that time, tape-intensive. (Halloran Aff. ¶8.e).

12.     Friedman recalls that Halloran discussed with him the issues National Indemnity was facing with its network system, consolidating the offices into a new building, and building a new Data Center. (S.J. Ex. 2, Deposition of Plaintiff Bruce Friedman ("Plf. Depo.") 109:15-23). These issues included persistent networking, storage, and vendor issues. (Plf. Depo. 114:3-4).

13.     Friedman understood that National Indemnity was looking for someone with expertise to provide the Company direction on those matters, and Friedman understood he would have a role in addressing those issues. (Plf. Depo. 109:7-18, 24-25).

14.     During the interview, Friedman discussed his experience and the types of work he had performed for prior employers. (Halloran Aff. ¶9).

15.     Based on Friedman's prior experience and his description of his skills, Halloran believed that Friedman possessed a breadth and depth of knowledge in the areas of network, server, and storage systems. (Halloran Aff. ¶10).

16.     During the interview, Friedman was asked how he would solve problems involving storage capacity and Friedman provided ideas for solving these problems. (Plf. Depo. 115:10-24; 116:1-4).

17.     Because Halloran had determined the Data Center project required a rare combination of network, server, and storage experience, Halloran was optimistic that Friedman's skill set was a good fit for the role. (Halloran Aff. ¶12).

18.     Halloran believed, based on Friedman's interview, that Friedman had background and experience in network, server, and storage systems that Halloran believed the role required. (Halloran Aff. ¶12).

19.     Halloran also believed the Friedman's skill sets and knowledge of technologies did not exist anywhere else in the Company. (Halloran Depo. 14:9-11).

C.      Friedman's Employment

20.     Friedman was hired on or around May 12, 2015, in the role of IT Senior Systems/Software Engineer. (Halloran Aff. ¶13). Friedman's annual salary was $95,000.00. (Halloran Aff. ¶14).

21.     The IT Senior Systems/Software Engineer job description is generally applicable to all Senior Engineers and does not differentiate between the sub-specialties in which a Senior Engineer may focus. (Halloran Aff. ¶18; S.J. Ex. 13, Job Description). As such, Halloran expected Friedman to have responsibilities for the Data Center, network systems, and storage systems. (Halloran Aff. ¶18). Other duties outlined in the job description were performed by other Senior Engineers. (Halloran Aff. ¶18).

22.     In his Complaint, Friedman described his job duties as "the repair of computer hardware and related equipment, installing, configuring, testing, and troubleshooting computer networks, hardware, and operating systems." (Complaint, Filing No. 1, ¶III.C).

23.     Friedman's primary duties were those discussed with Friedman during his interview, including assisting with architecting and implementing a new network topology and a new storage topology inside the new Data Center. (Halloran Depo. 13:4-10; Plf. Depo. 118:8-10; Halloran Aff. ¶¶ 5, 9, 19).

24.     Due to the nature and scope of Friedman's responsibilities, Friedman needed and was granted the highest level of permissions in the Windows environment. (Halloran Aff. ¶20). This is called Domain Administrator Rights. (Halloran Aff. ¶20). This allowed Friedman to effectively access all technology-based resources in the Company. (Halloran Aff. ¶20).

### D.     Research and Recommendations

25.     After Friedman began his employment with National Indemnity, Halloran explained to Friedman the business requirements for the Data Center. (Halloran Aff. ¶21).

26.     Halloran relied on Friedman to map out alternatives in hardware and software that could meet those requirements. (Halloran Aff. ¶21; Halloran Depo. 19:7-10; 34:14-19).

27.     Halloran expected Friedman to work with vendors to explain the Company's requirements and explore how the vendors' proposed solutions and technologies would meet those requirements. (Halloran Aff. ¶21).

28.    Friedman corresponded with prospective vendors to explore "enterprise wide solutions, offerings, and design goals" and to address issues related to "significant portions of the server/utilization and directory infrastructure." (S.J. Ex. 10 at Friedman/National Indemnity 00646-00647; Friedman/National Indemnity 000652; Friedman/National Indemnity 000657).

29.    Friedman presented Halloran with recommendations regarding how well the proposed solutions met the present requirements, any budgetary considerations, any additional requirements for the future, and the reliability of the vendor. (Halloran Aff. ¶22; Halloran Depo. 19:2-7; 34:23-35:7).

30.    Halloran expected Friedman to make well-informed recommendations as to which vendors and which products properly matched the Company's requirements at a reasonable cost. (Halloran Depo. 37:12-16; 73:10-15).

31.    Halloran then assessed Friedman's recommendations, usually with the involvement of others. (Halloran Aff. ¶22).

32.    For example, Friedman recommended the installation of a new Storage Area Network ("SAN") device[7] in 1314 Douglas. (Halloran Depo. 46:24-25; Halloran Aff. ¶28). The Company followed this recommendation and acquired the SAN device, which displaced an old SAN device at the Midtown Campus. (Halloran Depo. 46:24-47:2).

33.    Friedman also recommended that the Company use Tintri because National Indemnity was having problems with performance on its EMC VNX[8] devices. (Halloran Aff. ¶25). Tintri is a high performing storage tool for virtualization storage, a technology toward which National Indemnity was moving. (Halloran Aff. ¶25).

34.    Friedman also recommended the use of Arista switches for the Data Center's core network. (Halloran Aff. ¶26). At that time, Friedman was the only NICO employee who had experience with Arista. (Halloran Aff. ¶26). Friedman then engineered the interplay between access devices, aggregation devices and the network core through Arista switches. (Halloran Aff. ¶26).

35.    Friedman also recommended the Company use Avamar/Data Domain hardware and software with its backup storage device. (Halloran Aff. ¶27). Friedman

---

[7]A Storage Area Network (SAN) device is utilized in the Company's storage processes. (Halloran Aff. ¶28).
[8] EMC VNX a specific SAN storage system that is used for the storage and sharing of massive amounts of data. (Halloran Aff. ¶25).

recommended the use of these products and explained to Halloran why he believed National Indemnity needed them. (Halloran Aff. ¶27). At that time, Friedman was the only NICO employee who had experience with Avamar/Data Domain. (Halloran Aff. ¶27).

36.     Although Friedman repeatedly testified in his deposition that he merely presented "facts and choices" to NICO's management, his pre-litigation communications reflect he was "given charge to develop, plan, and articulate key strategies" for National Indemnity, and he made recommendations regarding which technologies the Company should implement as well as cost/benefit expectations. (Plf. Depo. 149:4-10, 16-17; 156:21-23; 164:12-16; 165:16-18; 166:6-12; 200:1-4; S.J. Ex. 10, Friedman/National Indemnity 00646-00647, 00652; S.J. Ex. 5 & 15, Recording and Transcript, p. 77 and 1:25:32).

37.     Friedman admits he made recommendations for addressing storage issues, including recommendation about "the VAR[9] to be used, the appropriate cost model, the expected discount, the technology being used, the deployment, the size, the throughput, the scope of the problem, and the solutions, and the breadth of available solutions that [National Indemnity] hadn't looked at." (Plf. Depo. 116:5-17; 117:4-7).

38.     Friedman also admits he made recommendations to resolve the Company's vendor issues, including recommendations about "components, about pricing, about the VAR that was going to service or sell the product, about warranty, about service, about the technology that was being used, about a plethora of things." (Plf. Depo. 114:15-16; 114:21-115:2).

39.     According to Halloran, the depth of Friedman's knowledge in storage systems and network systems made Friedman a valuable asset in the process of renovating the Company's technologies. (Halloran Depo. 147:19-21).

40.     Friedman did not have authority to execute a purchase order or to spend money without the approval of Halloran (or, later, Chirhart within his authority of

---

[9] "VAR" stands for value-added reseller. (Halloran Aff. ¶23). VARs typically load applications or proprietary software onto computers and may also incorporate third-party options to design a complete solution for a client like National Indemnity. (Halloran Aff. ¶23). They can also act as a single point of contact between multiple IT vendors, making it easier for organizations like National Indemnity to purchase and manage a variety of technologies. (Halloran Aff. ¶23).

amounts up to $500.00). (S.J. Ex. 3, Deposition of Brian Chirhart ("Chirhart Depo.") 106:1-9; 126:7-19; 128:3-11).

41.     Though Halloran, as IT Director, was responsible for the final decisions, he often followed the Plaintiff's recommendations. (Halloran Depo. 19:13-14; 75:3-8; Plf. Depo. 114:19-20; 167:11-12).

42.     Halloran does not recall directing Friedman to change a technology recommendation, though he may have instructed Plaintiff to modify capacity or remove features or functions in order to obtain a better price. (Halloran Aff. ¶29).

### E.     Migrating Data and Connectivity

43.     Friedman was also responsible for determining how to migrate (move) the Company's data from the Midtown Campus to 1314 Douglas and migrate devices and infrastructure so as not to disrupt services. (Halloran Aff. ¶30).

44.     To this end, Friedman designed and established a high speed connection between the Midtown Campus and 1314 Douglas. (Halloran Aff. ¶31). He engineered the connection by working with vendors, tracking progress, testing, and validating the plan to make sure it was working properly. (Halloran Aff. ¶31).

45.     Friedman also worked on the infrastructure in 1314 Douglas and the connectivity between the Data Center and the outside world and between the Data Center and employee workstations within 1314 Douglas. (Halloran Aff. ¶32).

46.     At the time Chirhart began his employment at National Indemnity in February 2016, Friedman's role in the Data Center was to ensure that the Data Center infrastructure was operational from a network perspective. (Chirhart Depo. 48:18-21; 66:24-67:5).

47.     These duties involved configuration work required for the Data Center to be able to accept the applications and other pieces of equipment being utilized so that they would function in the new Data Center. (Chirhart Depo. 66:1-8).

### F.     Troubleshooting

48.     Friedman's duties included testing and troubleshooting high-level outages or significant problems. (Halloran Aff. ¶33; Chirhart Depo. 69:23-25; 70:4-8; 122:17-22).

49.     Troubleshooting requires studying the symptoms of an issue, determining the root cause of the issue, determining how to temporarily circumvent the root cause, if

necessary, and developing a recommendation for permanently resolving the root cause. (Halloran Depo. 142:16-21).

50.    Friedman was part of the team that would troubleshoot when high-level outages occurred or when essential devices were not performing as expected. (Halloran Aff. ¶ 34).

51.    Halloran expected Friedman to use his experience running diagnostics and drawing conclusions to determine what test(s) to run and then analyze the results of the test(s) to try to determine the root cause of the issue. (Halloran Aff. ¶36). Lower level employees do not have the skills or experience to perform such testing and analysis at Friedman's skill level. (Halloran Aff. ¶36).

52.    Because Friedman was the most knowledgeable IT employee across the combination of server, storage, and network topologies, Halloran believed Friedman's breadth of knowledge made him unique in a high-level troubleshooting role. (Halloran Depo. 145:13-15; 147:18-19).

53.    Friedman admits he was required to perform across a wide range of technological platforms in his work at National Indemnity. (Plf. Depo. 75:2-4).

54.    During the move to the Data Center, because National Indemnity was partially straddling the old environment and the new environment, Friedman's diagnostic skills made him particularly valuable because a number of unexpected situations arose during that process. (Halloran Depo. 148:2-13). Friedman's expertise was called upon to help assist when significant problems arose. (*Id.*).

55.    For instance, ImageRight is an application used by National Indemnity users. (Halloran Aff. ¶37). National Indemnity's insurance claim files and policy files, which are essential to its business, are stored in ImageRight. (Halloran Aff. ¶37).

56.    When National Indemnity experienced problems moving data in ImageRight from the server to storage, Friedman was asked to assist in resolving the problem. (Halloran Aff. ¶38).

57.    The Company needed to migrate 250 million pages of images at a pace that supported the business. (Halloran Aff. ¶38; Halloran Depo. 144:17-22). The process was moving too slowly and other individuals within the IT Department could not determine the reason. (Halloran Aff. ¶38; Halloran Depo. 144:17-22).

58.     Friedman was asked to troubleshoot what was happening and determine the root cause of the slow migration. (Halloran Aff. ¶38; *see also* Chirhart Depo. 108:19-109:7).

59.     Friedman's specialized skills across the server and storage disciplines were essential to helping the Company optimize performance in the ImageRight migration process. (Halloran Depo. 144:22-25).

60.     Friedman would also assist in troubleshooting with other teams, if those teams did not have the ability to competently troubleshoot the problem. (Chirhart Depo. 82:9-17; 88:2-15).

61.     Friedman testified that he would be asked about server issues "when it was super complex or super painful." (Plf. Depo. 203:9-12).

62.     Friedman also coordinated conference calls with vendors to address storage issues that arose, such as with the Tintri technology. (S.J. Ex. 10 at Friedman/National Indemnity 00397; Halloran Depo. 81:12-18).

63.     With respect to the Tintri technology, Friedman was involved in the testing and troubleshooting required to make the Tintri product operational. (Halloran Depo. 81:19-23).

64.     When Friedman assisted in repairing issues, he did not make manual repairs but rather performed programming and drafted configurations[10] to implement the necessary solutions. (Chirhart Depo. 122:2-16; S.J. Ex. 13, Job Description, p. 2).

65.     NICO's service desk fields telephone calls or reports of IT problems. (Halloran Depo. 65:22-24). The service desk reviews the problem and attempts to resolve the problem. (Halloran Depo. 65:24-25).

66.     If unable to resolve a problem, the service desk assigns the issue to a service engineer, who has a higher level of expertise. (Halloran Depo. 65:25-66:9). If the service engineer cannot solve the problem, then the issue is elevated to an engineering team. (Halloran Depo. 66:21-67:7; 69:1-18).

67.     A member of the third-level engineering team might consult with Friedman on troubleshooting the issue if, for instance, the issues involved something unique to a design that Friedman had installed. (Halloran Depo. 69:19-70:7).

---

[10] Configuration work frequently involves making complex decisions, such as how to lay out storage. (Hallroan Depo. 47:7-11).

68.     Troubleshooting would normally escalate to Friedman if he were approached by a third-level person who could not solve the problem or a team of people that had been tackling a problem without success. (Halloran Depo. 94:8-16).

69.     The problems Friedman was expected to troubleshoot were not problems with individual computers, but were larger network or storage problems that affected all users and the entire network. (Chirhart Depo. 70:11-19; 122:11-16).

### G.     Friedman's Responsibility for the Company's Storage

70.     Friedman was the most knowledgeable employee concerning NICO's storage environment. (Chirhart Depo. 37:7-15).

71.     Chirhart testified he would not have trusted the storage environment to anyone on his team other than Friedman. (Chirhart Depo. 37:16-21).

72.      Friedman's responsibilities with respect to storage included determining the type of storage needed for the server or device (expensive, fast storage versus less expensive, slower storage), allocating and configuring storage for new servers or devices, and creating the necessary storage LUN[11] or pool. (Chirhart Depo. 73:10-22).

### H.     Physical Move to the Data Center

73.     Friedman was one of five or six people involved in moving network devices from the Midtown Campus to the Data Center, though desktop support personnel would also occasionally assist in disconnecting and carrying simple devices. (Halloran Depo. 24:13-20).

74.     With respect to moving devices from the Midtown Campus to 1314 Douglas, it was necessary to structure the move so as to not disrupt business activities. As such, the IT Department had to move certain services at certain times consistent with the equipment that had to be installed for those services. (Chirhart Depo. 52:22-53:3).

75.     According to Friedman, the sequence of moving equipment into the new Data Center depended on whether the equipment was new, whether it was redundant, or whether it would be disruptive in nature to the operation of the business. (Plf. Depo. 1598:23-159:5).

76.     Although some physical moving occurred before May 1, 2016, the majority of the physical moving of systems from the Midtown Campus to 1314 Douglas occurred

---

[11] A "LUN" is essentially a block of storage. (Chirhart Depo. 74:1-3).

on May 1, 2016. (Chirhart Depo. 96:2-15; Halloran Depo. 23:25-24:9; S.J. Ex. 10 at Friedman/National Indemnity 00408-00410).

77.    Friedman testified that much of the work of physically moving devices to the 1314 Douglas building "absolutely needs to be [performed by] an IT person." (Plf. Depo. 157:23-25).

I.    **Friedman's Request for a Promotion**

78.    Friedman, Chirhart, and Halloran all agreed that Friedman was the most technically proficient NICO employee in the areas of network topology and design, and storage architecture and design at the time of his employment. (Plf. Depo. 70:16-19; Halloran Aff. ¶39; Chirhart Depo. 39:11-13).

79.    During his employment, Friedman wrote to Halloran, "I am working as hard as I ever have, I am doing some of my best work. I believe I have been very successful in the work I have accomplished, <u>I feel like I have been very effective at managing a significant number of highly technical and extraordinarily difficult tasks</u>." (S.J. Ex. 10 at Friedman/National Indemnity 00510) (emphasis added).

80.    Near the end of his employment, Friedman asked for a raise and a promotion. (S.J. Ex. 10 at Friedman/National Indemnity 00291-00293).

81.    Friedman testified that this request was based on his output, his results, his abilities, and the value he added to the Company, which he believed "spoke for itself." (Plf. Depo. 160:19-23; 162:12-14).

82.    Friedman stated that his "efforts, hours, and most importantly, [his] results speak volumes about the benefits received by National Indemnity." (Plf. Depo. 190:11-13; S.J. Ex. 10 at Friedman/National Indemnity 00293).

83.    Friedman also admitted that his workload could only be reduced by "technically qualified and trained personnel." (Plf. Depo. 190:14-18; S.J. Ex. 10 at Friedman/National Indemnity 00293).

84.    Friedman testified, "[T]o say that when I'm running cable or moving servers or doing those things is work that you could go hire manpower people to come in and do, that's not true. **You can't just augment staff, even at this level, with just anybody. They have to know how to do it**." (Plf. Depo. 191:9-14) (emphasis added).

85.    Friedman maintained he was technically superior to others in the IT Department, and stated that "the disparity of skills, knowledge, ability, and training

between what [he has], day-to-day, demonstrated versus those demonstrated by [his] peers and co-titled workers at National Indemnity is, again, bolstered by obvious and specific evidence, including work performed, errors and omissions, design, and implementation." (Plf. Depo. 194:11-21; S.J. Ex. 10 at Friedman/National Indemnity 00292).

### J.   Indisputably, Friedman Was a Senior Network/Systems Engineer

86.   In e-mails, Friedman described himself as a Senior Network/Systems Engineer. (See Exhibit 10 at Friedman/National Indemnity 00250, 00328, 00397, 00418-00422, 00511-00512, 00518, 00539, 00576-00577, 00647-00648; Filing No. 1, Complaint, ¶III.C).

87.   Friedman has also described himself prior to this litigation as "a hands-on, non-managerial technical asset of NICO [who was] mostly responsible for the design, configuration and implementation of our network, storage, and datacenter infrastructure." (S.J. Ex. 10 at Friedman/National Indemnity 000652; Friedman/National Indemnity 000657). His tasks included addressing "significant portions of the server/utilization and directory infrastructure," and he described himself as "the principal engineer in this POC/Demo/Validation." (S.J. Ex. 10 at Friedman/National Indemnity 000652; Friedman/National Indemnity 000657).

88.   Friedman also described himself as "the network/Infrastructure Architect for NICO (FTE)" and informed vendors he was "working on the business justification and use case for internally licensed pen, vuln, and config[12] analysis." (S.J. Ex. 10 at Friedman/National Indemnity 000657).

89.   During his employment, Friedman described his role and responsibilities at NICO as follows: "I report directly to Dennis, and have been given charge to develop, plan and articulate some key strategies for the organization. Network, Storage, Virtualization, DR, and Security are principal deliverables of my current responsibilities…. I am interested in getting to know you, your understanding of EMC's relationship with National Indemnity and then we should address enterprise wide solutions, offerings, and design goals." (S.J. Ex. 10 at Friedman/National Indemnity 00646-00647).

---

[12] "Pen, vuln, and config" analysis refers to an analysis of the Company's then-existing penetration, vulnerabilities, and configurations. (Halloran Aff. ¶40). These are activities that are required by certain regulatory and compliance bodies to help ensure the security of the infrastructure environment. (Halloran Aff. ¶40).

90.     Friedman considers himself to be an infrastructure architect. (Plf. Depo. 65:17-19).

**K.     The Sophisticated Nature of Friedman's Job Duties are Evident from Freidman's E-mail and Oral Communications**

91.     Friedman's communications while employed with National Indemnity also demonstrate the complex and sophisticated nature of his job duties. By way of examples, Friedman has stated:

a.     "As you can see the topology holds fine and across multiple L2 hops, trunks, and re-routes the 3024_Main_RACK switch tells the best story, it is mismatched as you can see, it is fine and the last ping to Google DNS actually converges from 3024 to 2962 to 1314 and back to 3024 and out COX in 3024 in this case and that return traffic from Google DNS does the EXACT same loop… I am happy to explain exactly why this works, and perhaps we could do that at a lower volume and demeanor." (S.J. Ex. 10 at Friedman/National Indemnity 000327).

b.     "…[T]here were periods of days where Sophos was disabled and attempting to update itself filling the log files with attempt after attempt of failed updates, service starts and failures. RPC, VMI, and Kerberos were also affected. DNS, NETBios, MTU, TCP/IP Queue, and interrupts were changed as a result.  … I am concerned that he is able to log into Domain Controllers, apply GPO's to Domain Controllers, apply GPO's to OU's specifically blocking GPO's and deeply impact core infrastructure without any collaboration or involvement of the engineers charged with the infrastructure he has affected.  **WSUS and Windows Updates are complex and have significant risk of affecting core infrastructure when done incorrectly….".**" (S.J. Ex. 10 at Friedman/National Indemnity 000249) (emphasis added).

c.     "…[A]n inexperienced and in my opinion unqualified person made global decisions effecting (sic) my work, and the things I am accountable for without even the most brief notification, conversation or heads-up. …I have remediated as much as I can tonight, DFS is still not 100%, there are inconsistencies I haven't figured out yet." (S.J. Ex. 10 at Friedman/National Indemnity 000250).

d.     "[A]fter some more adjustments, including re-prioritizing the services in the Image Right App Server and ICON servers from normal to realtime, stopping all Sophos services, stopping Avamar services, managing network

optimizations such as MTU size, Queue depth, interrupt buffers and size, installing failed and necessary critical, important and system patches, and properly managing MPIO I achieved a 173% improvement of file transfer rates over the NicoIR20 server coping to Tier 1 storage (TinTri) with the NicoIR01 server writing to Tier 3 storage on the VNX." (S.J. Ex. 10 at Friedman/National Indemnity 00419).

       e.     "I expect that in 30-60 days I will be in a position to cut a PO to the right vendor for some or all of what I test and validate. Again, I am working on business justification and use case/vendor qualification. … Hopefully that answers all of the questions you need answers for to get us started. Once I get some initial testing and reporting, I will come back to you for initial pricing and configuration to help set expectations for cost/benefit with the executives." (S.J. Ex. 10 at Friedman/National Indemnity 000652).

       f.     "The root cause of the issue is that we do not have backups today of our Guest OS's on Hyper-V. I am very concerned about this. Then the next issue is we have successive failures in well-thought out, well-funded and highly resilient systems. I am also very concerned about this. … I was doing work that I am well-qualified for, highly experienced with and well within the current standards of change-control." (S.J. Ex. 10 at Friedman/National Indemnity 00538).

       g.     "I am enthusiastic about all of the progress we have made, I believe we have overcome many of our challenges and have extraordinary systems to show for our hard work. I am also enthusiastic about getting proper controls and accountability in place **so that I don't feel ultimately responsible for nearly everything in our infrastructure**." (S.J. Ex. 10 at Friedman/National Indemnity 00539) (emphasis added).

       h.     "As this is imperative and crucial part of our infrastructure, we have elected to address the fail-over testing and validation tomorrow night (Wednesday, November 4, 2015) we are able to effect production systems and services commencing at l0:00PM Central time and as such I suggest that we begin Web-Ex/Conference Calls at 9:45PM tomorrow night." (S.J. Ex. 10 at Friedman/National Indemnity 00397).

     92.    In a meeting with Chirhart and Halloran, Friedman described his work duties in the following ways:

       i.     "This ticket with Rackspace has been open a month and I keep trying to get it wrestled to the ground…And I got on the phone with Rackspace again, and

I didn't get off the phone with them until 5:00 in the morning. And that's not unusual for some of the projects or pieces that that I'm doing, where it's either turn it over finished and working in the morning, or path tucking and go through this long extended period of time, that's how that ticket ended up being on both, because by the time I got back to getting Dale or anybody else to work on it... And then I just got another four hours this morning, because it still wasn't working." (S.J. Ex. 5 & 15, Recording and Transcript, p. 16 and 0:13:44).

        j.     "Everybody said this stuff can't go on tier three, and I... And it absolutely can. And they kept finding reasons why it couldn't, they stacked to death because they didn't want it there. … And at the end of the day, I...  got it there, and everybody was amazed that I got it there, but I had literally a week to take everything that everybody had done, and... And only a week before the migration, the first migration, the only certified process that they had done, was plan B." (S.J. Ex. 5 & 15, Recording and Transcript, p. 57 and 1:03:23).

        k.     "Again, the magnitude of changes that took place during that week to get ImageRight up, there were thousands of changes that were made during that week by me." (S.J. Ex. 5 & 15, Recording and Transcript, p. 61 and 1:09:01).

        l.     "I spent so much time, and was so vigorous about what I did with the, um, ImageRight piece, was because I knew what I could do. But I had to prove it. And I wanted you to be able to know that we could put it on tier three, that I could get the throughput that they needed, and even better than they'd ever gotten with TinTri's. And I had a finite amount of time to do it..." (S.J. Ex. 5 & 15, Recording and Transcript, p. 90 and 1:40:48).

        m.     "I don't know how to get you comfortable with something you're not comfortable with. Um, but when I know it, I know it. This is one of those things I know, Dennis, it's... It's better technology, and it's ultimately gonna cost you less money, and it's gonna give you a whole lot of advantages that you probably don't see yet. But this isn't a question about them. And, and to go back into ASAs regardless of how big you get, it's gonna be... For whoever sits in my job for me, for whatever period of time that is, and for whoever else sits in my job, it's gonna make that far more difficult to be good for you." (S.J. Ex. 5 & 15, Recording and Transcript, p. 77 and 1:25:32).

n.      "But it's hard for me when the majority of the things that you have talked about, um, do not feel as clear cut to me as they feel to you. Because when it's... I moved these things and I didn't document it, those are easy for me, I...I agree with you, I didn't do that, and I own that, and I will change that. I don't wear the clothes that you want me to wear every day, that's true, and I agree with that, and I will change that. The VPN to Rackspace, and the time that you're spending, and why were you on the phone for eight hours? Those things, are... They're just not that straightforward, they're just not. And again, the best example I've got is when... When I troubleshoot this VPN that we're coming in with right now, it's gonna take hours." (S.J. Ex. 5 & 15, Recording and Transcript, p. 88 and 1:38:58).

### L.      Lack of Supervision

93.      Friedman generally worked independently and with limited supervision. (Halloran Depo. 29:4-6; 33:6-16).

94.      According to Halloran, Friedman and Halloran met frequently, but Friedman was aware of objectives and worked independently in pursuit of those objectives. (Halloran Depo. 33:8-13).

95.      Friedman worked at night and regularly took Tuesdays off and did not require permission to do so. (Chirhart Depo. 90:13-16).

96.      Because Friedman's work often involved technology that was essential to the Company's business, some of Friedman's work had to occur after hours when it would not disrupt users or the Company's business. (Chirhart Depo. 75:11-14; S.J. Ex. 10 at Friedman/National Indemnity 00397).

97.      For example, if Friedman's work would have a system-wide impact, such as rebooting devices that are not redundant, making any major network changes, or maintenance on the Internet circuit, that work had to occur after hours. (Chirhart Depo. 75:24-76:7; 91:9-16).

## IV.      ARGUMENT(S)

### A.      Summary Judgment Standards.

"Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." *Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1050 (8th Cir. 2007); Fed. R.

Civ. P. 56(c). Once the moving party meets its burden to show that there is no issue of material fact, the plaintiff must provide evidence of specific facts (beyond allegations made in his complaint) to create a triable controversy. *Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004). "Summary judgment is mandated if the nonmoving party fails to establish the existence of an essential element of [his] case. [A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Popp Telecom, Inc. v. American Sharecom, Inc.*, 361 F.3d 482, 487 (8th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

> In order to withstand a motion for summary judgment, the nonmoving party must substantiate [his] allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" . . . "A mere scintilla of evidence is insufficient to avoid summary judgment." Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Riggs v. County of Banner*, 159 F. Supp. 2d 1158, 1163 (D. Neb. 2001) (citations omitted). "Evidence, not contentions, avoids summary judgment." *Mayer v. Nextel W. Corp.*, 318 F.3d 803 (8th Cir. 2003).

The determination of whether an employee's particular activities excluded him from the overtime benefits of the FLSA is a question of law to be resolved by the courts. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S. Ct. 1527, 89 L. Ed. 2d 739 (1986); *Ortega v. Bel Fuse, Inc.*, Case No. 15-21229-CIV-ALTONAGA/O'Sullivan, 2016 U.S. Dist. LEXIS 52867, *17 (S.D. Fla. Apr. 20, 2016) (citing *Icicle*, 475 U.S. at 714). Summary judgment is a commonly-used device to resolve exemption determinations under the FLSA. *See Ortega*, 2016 U.S. Dist. LEXIS 52867 (granting summary judgment in favor of employer because the employee was exempt under the computer employee exemption); *Grills v. Hewlett-Packard Co.*, 88 F. Supp. 3d 822 (N.D. Ohio 2015) (granting summary judgment and dismissing the plaintiff's FLSA overtime claim  because the employee was exempt under the computer employee exemption and discussing several cases doing the same). Here, there is no material dispute about Friedman's job activities. Friedman's FLSA overtime claim should be dismissed because

the undisputed facts demonstrate that Friedman was exempt from overtime as a matter of law.

**B.      Friedman Satisfies the Salary Basis Requirement of the FLSA Exemptions.**

The FLSA's regulations require that an employee be paid on a salary basis of at least $455 per week in order to be exempt from the FLSA overtime requirements. 29 U.S.C. §§ 207(a)(1); 213(a)(1); 29 C.F.R. § 541.200.  It is undisputed that Friedman was paid on a salary basis of $95,000.00 per year. (Halloran Aff. ¶14).  As such, Friedman satisfies the salary basis requirement for the FLSA's computer, administrative, and combination exemptions.

**C.      Friedman Was Exempt from Overtime Because His Primary Duties Were Exempt Work.**

The undisputed facts demonstrate that Friedman's responsibilities were "more than sufficient" to bring him "squarely within" the computer employee, administrative, and combination exemptions of the FLSA. *See Ortega*, 2016 U.S. Dist. LEXIS 52867, *39 (S.D. Fla. Apr. 20, 2016); 29 U.S.C. §§ 213(a)(1), 213(a)(17); 29 C.F.R. § 541.708.

1.      Standards for Exemptions.

To qualify for an exemption, an employee's "primary duty" must be the performance of exempt work. 29 C.F.R. § 541.700(a). "Primary duty" means the "principal, main, major or most important duty that the employee performs." Id. The determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Id. Factors to consider when determining the primary duty of an employee include, but are not limited to:

- The relative importance of the exempt duties as compared with other types of duties;

- The amount of time spent performing exempt work;

- The employee's relative freedom from direct supervision; and

- The relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). Although the amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee, time alone "is not the sole test." 29 C.F.R. § 541.700(b). Exempt employees are not required to spend more than 50 percent of their time performing exempt work. Id. Rather, employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion. Id.

Activities "directly and closely related to [exempt] work" are also considered "exempt work." 29 C.F.R. § 541.702. Work that is "directly and closely related" to the performance of exempt work includes tasks related to exempt duties and that contribute to or facilitate performance of exempt work. 29 C.F.R. § 541.703. "Directly and closely related" work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the employee's exempt work cannot be performed properly. Id. Work "directly and closely related" to the performance of exempt duties may include monitoring and adjusting machinery. Id.

Occasional, infrequently recurring tasks that cannot practicably be performed by nonexempt employees, but are the means for an exempt employee to properly carry out exempt functions and responsibilities, are considered exempt work. 29 C.F.R. § 541.707. In determining whether such work is exempt work, courts may consider:

- Whether the same work is performed by any of the exempt employee's subordinates;

- Practicability of delegating the work to a nonexempt employee;

- Whether the exempt employee performs the task frequently or occasionally; and

- Existence of an industry practice for the exempt employee to perform the task.

The use of manuals, guidelines or other established procedures containing or relating to highly technical or complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption. 29 C.F.R. § 341.704. The undisputed facts demonstrate that Friedman's

primary duties were the performance of exempt work under the computer employee, administrative, and combination exemptions.

        2.    <u>Friedman Was Exempt from Overtime Under the Computer Employee Exemption</u>.

        *a.    Standards for the Computer Employee Exemption.*

Under the FLSA's computer employee exemption, an employee is exempt from overtime if he is "a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker," whose primary duty is--

    (A)    the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

    (B)    the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

    (C)    the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

    (D)    a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills.

29 U.S.C. § 213(a)(17).

Friedman was specifically hired to perform the type of duties identified in the computer employee exemption. (Halloran Aff. ¶¶ 5, 8, 16, 19). 29 U.S.C. § 213(a)(17). At the time of Friedman's hire, the Company was embarking on a move to a new facility that involved designing and building the new Data Center. (Halloran Aff. ¶¶4-5; Plf. Depo. 109:15-23). The Company was looking for someone with experience across a broad range of technologies, including network and storage systems, and data center infrastructure. (Halloran Aff. ¶¶8, 12). This individual would need to understand and be able to analyze network and storage systems in a way that enabled the Company to migrate all Company data to the new Data Center, design and establish new network topologies within the Data Center and 1314 Douglas, modernize the Company's back-up strategy, and implement new technology for the Company's storage systems. (Halloran Aff. ¶¶5, 8, 12).  All of this had to be done with consideration of how the network, storage, and Data Center solutions would fit into a future disaster recovery

strategy to be implemented after the completion of the migration to 1314 Douglas. (Halloran Aff. ¶5.j).

Friedman was selected for this role because of the depth and breadth of his knowledge in the areas of network, server, and storage systems. (Halloran Aff. ¶10, 12; S.J. Ex. 12, Application & Resume). Friedman had the background and experience in network, server, and storage systems that the role required, and Friedman's skillset combination did not exist anywhere else in the Company. (Halloran Aff. ¶12; Halloran Depo. 14:9-11; S.J. Ex. 12, Application & Resume).

During his employment, Friedman worked with complex processes that had "significant risk of affecting core infrastructure when done incorrectly." (S.J. Ex. 10 at Friedman/National Indemnity 000249) (emphasis added). He was "responsible for the design, configuration and implementation of [National Indemnity's] network, storage, and datacenter infrastructure" and was "tasked with addressing significant portions of the server/utilization and directory infrastructure." (S.J. Ex. 10 at Friedman/National Indemnity 000652; Friedman/National Indemnity 000657). He admitted he was "given charge to develop, plan and articulate some key strategies for the organization," including network, storage, virtualization, and security systems. (S.J. Ex. 10 at Friedman/National Indemnity 00646-00647). These are precisely the kind of duties that constitute exempt work under the FLSA's computer employee exemption. *See* 29 U.S.C. § 213(a)(17).

> **b.** *Troubleshooting high-level issues is exempt work under the computer employee exemption.*

Under the computer employee exemption, troubleshooting IT system issues is exempt work where it involves escalated or advanced problem solving, such as analyzing system data or testing to determine the root cause of complex issues and recommending solutions from alternatives. *See, e.g., Bernard v. Group Pub., Inc.*, 970 F. Supp. 2d 1206, 1212 (D. Colo. 2013) (providing "Tier III" support and researching solutions were among employee's exempt duties); *Clarke v. JPMorgan Chase Bank, N.A.*, No. 8-cv-2400-CM-DCF, 2010 U.S. Dist. LEXIS 33264, *11, 19-21 (S.D.N.Y. Mar. 26, 2010) (providing network support on escalated issues was an exempt duty); *Young v. Cerner Corp.*, No. 06-321-CV-W-NKL, 2007 U.S. Dist. LEXIS 63566, *43-44 (W.D. Mo. Aug. 28, 2007) (plaintiff was exempt where her primary duty was system or program

defect resolution, or "trying to fix the issue," which consisted of testing her solutions and analyzing data); *Bobadilla v. MDRC*, No. 03-cv-9217, 2005 U.S. Dist. LEXIS 18140, *24 (S.D.N.Y. Aug. 24, 2005) (advanced network analysis functions were exempt work); *Olorode v. Streamingedge, Inc.*, No. 11-cv- 6934-GBD-AJP, 2014 U.S. Dist. LEXIS 59421 (S.D.N.Y. April 29, 2014) (a systems support technician who was responsible for troubleshooting computer problems and testing new software for functionality to provide critical network and software was exempt). This is the case even if manuals, guidelines, or established procedures are consulted in order to address difficult and novel circumstances. 29 C.F.R. § 541.704. Duties involving analyzing and identifying the root cause of problems with the computer networks and identifying areas for improvement have routinely been found to constitute exempt work. *Clarke*, 2010 U.S. Dist. LEXIS 33264, at *50; *Campbell v. Kannapolis City Schools Board of Education*, 55 F. Supp. 3d 821, 825-26 (M.D.N.C. 2014) (analyzing data to determine problems regarding network issues was exempt work); *Grills v. Hewlett-Packard Company*, 88 F. Supp. 3d 822, 826-27 (N.D. Oh. 2015) (gathering data on networking issues, analyzing the data, troubleshooting, and testing network issues were exempt duties); *Ortega*, 2016 U.S. Dist. LEXIS 52867, at *38 (diagnosing and determining the issue were exempt duties).

Here, Friedman was tasked with troubleshooting when significant issues could not be resolved by the help desk, service engineer, or third-level engineers responsible for troubleshooting problems. (Halloran Depo. 65:22-67:7; 69:1-70:7). Freidman was, in essence, a last line of defense. (Halloran Depo. 69:1-70:7). Friedman was the most knowledgeable IT employee across the combination of server, storage, and network topologies, and this breadth of knowledge made Friedman uniquely qualified to perform sophisticated troubleshooting tasks. (Halloran Depo. 145:13-15; 147:18-19; Halloran Aff. ¶39). While National Indemnity was straddling the old environment and the new environment during its transition to 1314 Douglas, Friedman's diagnostic skills made him particularly valuable because a number of unexpected situations arose during that process. (Halloran Depo. 148:2-13).

Friedman admitted he would assist in troubleshooting issues that were "super complex or super painful," thus confirming his work fell well within the scope of the exemption. (Plf. Depo. 203:9-12). *See Clarke*, 2010 U.S. Dist. LEXIS 33264, at *19-20; *Grills*, 88 F. Supp. 3d at 826 (the plaintiff "regularly handles the most serious and

complex issues escalated to the Level II team and which could have had a potential significant impact on the client's business"). That Friedman was tasked with troubleshooting the most significant problems facing the Company's infrastructure is also evident from the amount of time it took to resolve those problems. (*See* S.J. Ex. 5 & 15, Recording and Transcript, at p. 88 and 1:38:58 ("When I troubleshoot this VPN that we're coming in with right now, it's gonna take hours.")).

Any argument by Friedman that the fact he performed "troubleshooting" work indicates he was non-exempt is not supported by the case law. Friedman was expected to troubleshoot large network or storage problems that affected all users and the entire network - not problems with individual computers. (Chirhart Depo. 70:11-19; 122:11-16; Halloran Aff. ¶34, 36). Troubleshooting escalated to Friedman if he was approached by a third-level person who could not solve the problem or a team of people that had been tackling a problem without success or if he was specifically asked by Halloran or another manager to get involved due to the breadth and scope of the issue. (Halloran Depo. 94:8-16). This type of troubleshooting is a far cry from the type of help desk repairs that have been found to constitute non-exempt work. *Compare Clarke*, 2010 U.S. Dist. LEXIS 33264, at *50 (plaintiff providing network support on escalated issues found exempt) *with Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 580-81 (6th Cir. 2004) (under a previous, narrower version of the exemption, installing hardware on workstations and configuring desktops was not exempt work); *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 52 (D.D.C. 2006) (help desk employee  whose primary duty was customer service was not exempt).

In *Clarke*, the plaintiff's job duties included responding to incidents that had been escalated to his attention after the issue could not be resolved by the help desk, desktop support, or the "third level support." *Clarke v. JPMorgan Chase Bank, N.A.*, 08 Civ. 2400 (CM)(DCF), 2010 U.S. Dist. LEXIS 33264, *18-20 (S.D.N.Y. Mar. 26, 2010). The plaintiff addressed the "most serious" issues during his employment. *Clarke*, 2010 U.S. Dist. LEXIS 33264, at *19-20. In doing so, the plaintiff would find the "root cause" of the issue and determine how to address it and prevent the issue from recurring in the future. *Id.* at *20-21.

The *Clarke* court rejected the plaintiff's attempt to "denigrat[e] his duties to make it appear as if he primarily performed lower-level help desk functions." *Clarke*, 2010 U.S.

Dist. LEXIS 33264, at *53. Rather, the court reasoned that the plaintiff's duties constituted exempt work because the most "difficult" and "critical" issues were escalated to the plaintiff, at which time he identified the root cause and devised a solution. *Id.* at *50, 53.

Here, too, Friedman addressed issues that could not be resolved by the help desk, service engineers, or other third-level engineers responsible for troubleshooting problems. (Halloran Depo. 65:22-67:7; 69:1-70:7). By his own admission, Friedman addressed issues that were "super complex or super painful." (Plf. Depo. 203:9-12). Friedman found the "root cause" of the issue and developed solutions. (Halloran Aff. ¶36; S.J. Ex. 10 at Friedman/National Indemnity 00538 ("The root cause of the issue is that we do not have backups today of our Guest OS's on Hyper-V.")). Any attempt by Friedman to "denigrat[e] his duties" to make it appear as if he primarily performed lower-level functions should be rejected because such a characterization is inconsistent with his own deposition testimony and with his pre-litigation communications. (Plf. Depo. 203:9-12; S.J. Ex. 10 at Friedman/National Indemnity 00249-00250, 00327, 00419, 00538; S.J. Ex. 5 & 15, Recording and Transcript, p. 88 and 1:38:58). *See Clarke*, 2010 U.S. Dist. LEXIS 33264, at *53; *Bobadilla,* 2005 U.S. Dist. LEXIS 18140, at *22 ("Although the plaintiff maintains that he spent most of his time performing Help Desk functions, Bobadilla was principally of value to MDRC because he had sophisticated knowledge of computing that went beyond that of a non-exempt Help Desk employee.").

   c.   *Other Factors Establish the Computer Employee Exemption Applies to Friedman.*

Courts analyzing the computer employee exemption have identified numerous other factors which suggest the exemption applies, and these factors also establish Friedman falls within the FLSA's computer employee exemption.

   i.   Technical certifications.

Where an employee holds technical certifications reflecting his expertise, this factor supports exempt status. *See Bobadilla*, 2005 U.S. Dist. LEXIS 18140, at *6-8; *Clarke*, 2010 U.S. Dist. LEXIS 33264, at *48; *Campbell*, 55 F. Supp. 3d at 823-24; *Grills*, 88 F. Supp. 3d at 827 & 832; *Ortega*, 2016 U.S. Dist. LEXIS 52867, at *36.

Friedman held technical certifications reflecting his expertise. (Plf. Depo. 85:12-18; 85:25-86:4; 86:13-14; S.J. Ex. 12 at Friedman/National Indemnity 00046-00050).

Like the plaintiffs in *Bobadilla* and *Clarke*, Friedman touted several certifications on his employment application, including Microsoft Certified Systems Engineer, Microsoft Certified Information Technology Professional, and Cisco Certified Network Associate. (Plf. Depo. 85:12-18; 85:25-86:4; 86:13-14; S.J. Ex. 12; S.J. Ex. 7, LinkedIn Page). These certifications reflect a high level of competence and subject matter expertise and suggest that Plaintiff was hired to perform high-level work consistent with these skills. (Halloran Aff. ¶11). *Grills*, 88 F. Supp. 3d at 827 (fact that the plaintiff "had obtained multiple technical certifications reflecting his high level of competence" supported a finding that the plaintiff was exempt).

ii.    <u>Recommendations about new technologies</u>.

The fact that an employee is responsible for making recommendations about new hardware or software also evidences exempt status. *Bobadilla*, 2005 U.S. Dist. LEXIS 18140, at *28-29 ("The plaintiff took the primary role in locating new software, Backup Exec, and based on the plaintiff's research and recommendations, MDRC introduced a new backup system."); *see also Clarke*, 2010 U.S. Dist. LEXIS 33264, at *50, ("[A]s part of his work on the backup migration project, Sarkar tested new versions of the NetBackup software, and discovered storage issues.").

Friedman made several recommendations about new technologies, many of which were implemented by the Company. (Halloran Aff. ¶¶24-28). Halloran relied on Friedman to map out hardware and software solutions to meet the Data Center's requirements, and expected Friedman to make well-informed recommendations as to which vendors and which products properly matched the Company's requirements at a reasonable cost. (Halloran Aff. ¶21; Halloran Depo. 19:7-10; 34:14-19; 37:12-16; 73:10-15). Despite Friedman's description of his duties in his deposition as merely providing "facts and choices" to management, statements in Friedman's pre-litigation correspondence and elsewhere in his deposition testimony confirm his essential role in making recommendations. (Plf. Depo. 149:4-10, 16-17; 156:21-23; 164:12-16; 165:16-18; 166:6-12; 200:1-4; S.J. Ex. 10 at Friedman/National Indemnity 00646-00647, 00652; S.J. Ex. 5 & 15, Recording and Transcript, p. 77 and 1:25:32).  For example, during a May 2016 meeting with Halloran and Chirhart which was recorded, Friedman supported one of his recommendations by stating, "This is one of those things I know, Dennis, it's... It's better technology, and it's ultimately gonna cost you less money, and it's gonna give

you a whole lot of advantages that you probably don't see yet." (S.J. Ex. 5 & 15, Recording and Transcript, p. 77 and 1:25:32).

Friedman's recommendations included technologies that were new to the Company, such as Tintri, Avamar/Data Domain, and Arista switches. (Halloran Aff. ¶¶25-27). Friedman also made recommendations regarding new storage technologies. (Halloran Aff. ¶28). Friedman worked with vendors to "address enterprise wide solutions, offerings, and design goals" and to "set expectations for cost/benefit with the executives." (S.J. Ex. 10 at Friedman/National Indemnity 00646-00647, 00652). These duties show Friedman satisfied the requirements of the computer employee exemption. *See Bobadilla*, 2005 U.S. Dist. LEXIS 18140, at *28-29.

iii.   <u>Value to employer</u>.

Courts also consider an employer's estimation of the employee's value when determining whether an employee is exempt. Where an employee is of value to the employer because of his sophisticated knowledge of computing that went beyond that of a lower-level Help Desk employee, the employee is typically exempt. *See Bobadilla*, 2005 U.S. Dist. LEXIS 18140, at *22; *Curry v. Matividad Med. Ctr.*, Case No.: 5:11-CV-04662 EJD, 2013 U.S. Dist. LEXIS 74761, *10 (N.D. Cal. May 28, 2013) ("[H]e was of value to NMC in more than just a non-exempt trouble-shooting support employee and was worth approximately $80,000 per year to NMC."); *Campbell*, 55 F. Supp. 3d at 829 ("[T]he record evidence establishes the skilled nature of Plaintiff's work and Plaintiff's value for his ability to perform such skilled work during his employ with Defendant.").

Friedman was of value to the Company in large part due his breadth and depth of knowledge across servers, storage, and network infrastructure, and Friedman does not dispute that he had such knowledge and experience. (Plf. Depo. 70:16-19; 75:2-4; Halloran Depo. 145:13-15; 147:18-19; Halloran Aff. ¶10, 12). This expertise enabled Friedman to provide valuable insight and recommendations on the Data Center technologies and network and storage concerns. (*See id.*; Halloran Aff. ¶¶21-28).

Friedman was also valued for his expertise in running tests to identify the root cause of an issue and analyzing the results to determine the cause. (Halloran Aff. ¶¶33-36). Other employees did not have the skills or experience to perform such testing and analysis at Freidman's skill level. (Halloran Aff. ¶36). In fact, at the time of his

30

employment, no other Company employee had Friedman's combination of skill sets and knowledge of technologies. (Halloran Depo. 14:9-11).

Like the plaintiffs in *Bobadilla*, *Curry*, and *Campbell*, Friedman's value was reflected in his annual salary of $95,000.00 and Friedman was valued for his ability to apply his expertise to recommending new technologies and solutions as National Indemnity moved from its prior environment to its new environment in the Data Center. (Halloran Aff. ¶¶14, 21-28, 33-36). *See Curry*, 2013 U.S. Dist. LEXIS 74761, at *10; *Campbell*, 55 F. Supp. 3d at 829. Other employees sought Friedman out due to his high level of skill, which also suggests Friedman was properly classified as exempt. (See S.J. Ex. 10 at Friedman/National Indemnity 00517-00519, 00576-00577). *Clarke*, 2010 U.S. Dist. LEXIS 33264, at *20; *Grills*, 88 F. Supp. 3d at 826.

iv.    <u>Responsibility for significant matters</u>.

Employees who are responsible for developing plans to address high-level concerns, such as sufficient storage capacity, are also typically found to be exempt. *Clarke*, 2010 U.S. Dist. LEXIS 33264, at *55-56 (employee was responsible for ensuring that servers affecting more than 10,000 users had sufficient storage capacity and spent much of his time developing disk space remediation plans); *Bobadilla*, 2005 U.S. Dist. LEXIS 18140, at *28-29 (creating a back-up software system and system upgrades).

Friedman was certainly responsible for significant matters, including the Company's data storage, which was largely entrusted to Friedman. (Chirhart Depo. 37:16-21). Friedman admits he made several recommendations with respect to storage and vendor issues. (Plf. Depo. 114:15-16; 114:21-115:2; 116:5-17; 117:4-7). He also admits he was involved in updating the core network. (Plf. Depo. 156:7-11). Friedman was responsible for developing, planning, and articulating "key strategies for the organization," and his "principal deliverables" included network, storage, virtualization, and security.   (S.J. Ex. 10 at Friedman/National Indemnity 00646-00647). He was "mostly responsible for the design, configuration and implementation of [National Indemnity's] network, storage, and datacenter infrastructure." (S.J. Ex. 10 at Friedman/National Indemnity 000652; Friedman/National Indemnity 000657). He felt "ultimately responsible for nearly everything in [National Indemnity's] infrastructure." (S.J. Ex. 10 at Friedman/National Indemnity 00539).

In his deposition, Friedman admitted that his work at National Indemnity involved working as a network engineer by taking an architecture and implementing it, making it operational, and supporting it. (Plf. Depo. 76:5-11). Though Friedman now claims this work was not a "substantial portion of [his] work," it is the role of the Court - not Friedman - to determine Friedman's primary duties here. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S. Ct. 1527, 89 L. Ed. 2d 739 (1986). Friedman's own opinions about whether his work was "substantial" are not binding on this Court. Rather, that is a determination for the Court to make based on the undisputed facts. *Icicle*, 475 U.S. at 714. This is particularly so here because Friedman's opinions about whether his work was "substantial" are not supported by facts. For instance, in his Responses to Requests for Admissions, Friedman admitted that he performed troubleshooting duties, but qualified this Response by stating that such work was "an insignificant portion of the work [he] actually performed." (S.J. Ex. 6, Plaintiff's Responses to Defendant's Requests for Admissions at Request No. 15). In his deposition, Friedman testified that he spent 60 to 70 percent of his time on troubleshooting and repair. (Plf. Depo. 204:1-5).[13] Friedman cannot create an issue of

---

[13] In this regard, Friedman's deposition testimony repeatedly contradicted his prior admissions. In his deposition, Plaintiff denied he worked as a senior level systems engineer for Windows-based servers, workstations, operating software, middleware, and peripheral equipment, but in his Responses to Defendant's Requests for Admissions ("Admissions"), Friedman admitted he performed such work. (*Compare* Plf. Depo. 200:14-19 *with* S.J. Ex. 6, Plaintiff's Admissions at Request No. 2; S.J. Ex. 13, Job Description). In his deposition, Friedman denied he performed any work described in Paragraph 2 of the Job Description, which included analyzing and identifying inefficiencies or problems within software and middleware systems, solving problems, and determining the need for additional hardware/software, upgrading hardware and/or software to enhance performance or capabilities of the system, and conducting follow-ups as needed, but Friedman admitted to performing those duties in his Admissions. (Plf. Depo. 202:8-18 *with* S.J. Ex. 6 at Request Nos. 4-5; S.J. Ex. 13, Job Description). Likewise, in his deposition, Friedman denied performing any work described in Paragraph 4 of the Job Description, including analyzing, planning, implementing, and maintaining backup and recovery mechanisms, and he denied performing the leadership and mentoring duties described in Paragraph 5 of the Job Description. (Plf. Depo. 202:23-203:5; S.J. Ex. 13, Job Description). However, Friedman admitted he performed these duties in his Admissions. (S.J. Ex. 6 at Request Nos. 11 & Request No. 13). A matter admitted in response to a Request for Admission is "conclusively established," and, as such, Friedman cannot contradict those admissions with his later deposition testimony. *See* Fed. R. Civ. P. 36(b). Moreover, Friedman's attempt to qualify his admissions by characterizing certain work as "insignificant" is precisely the type of tactic that courts routinely reject in analyzing whether an exemption applies. *See Clarke*, 2010 U.S. Dist. LEXIS 33264, *53 (rejecting the plaintiff's attempt to "denigrat[e] his duties to make it appear as if he primarily performed lower-level, helpdesk functions"); *Bobadilla*, 2005 U.S. Dist. LEXIS 18140, *22 (rejecting the plaintiff's claim that he spent most of his time performing Help Desk functions"); *Campbell*, 55 F. Supp. 3d at 828 (rejecting the plaintiff's "effort here to recast his role as one resembling a lower-skilled employee").

fact with his own subjective opinions about what constitutes a "substantial" portion of his work.

v.    <u>Lack of supervision.</u>

The fact that an employee works with limited supervision and does not require instruction on how to perform his job duties also supports a finding of exempt status. *Grills*, 88 F. Supp. 3d at 823 (the plaintiff "uses his expert judgment to resolve an issue and determine what tests need to be run to analyze the customer's particular problem in the customer's unique network"); *Ortega*, 2016 U.S. Dist. LEXIS 52867, at *38 ("No one had to instruct Ortega on how to test the system and network to make sure they were running properly.").

Here, no one instructed Friedman how to perform his job. Friedman generally worked independently to meet the objectives outlined by his supervisors and with limited supervision. (Halloran Depo. 29:4-6; 33:6-16). When troubleshooting, Friedman determined what test(s) to run to diagnose the problem and independently analyzed the results to determine the root cause. (Halloran Aff. ¶36). Friedman did not require permission to work after hours or to take Tuesdays off. (Chirhart Depo. 90:13-16). In fact, some of Friedman's duties had to be completed after hours due to the significance of the systems on which he was working to the Company's business. (Chirhart Depo. 75:11-14; S.J. Ex. 10 at Friedman/National Indemnity 00397).

Though Friedman had little direct supervision, he frequently met with his supervisors to discuss on-going projects, such that Halloran and Chirhart were aware of his progress. (Halloran Depo. 33:8-13; Chirhart Depo. 34:19-35:7, 99:3-8). He also regularly communicated his work through e-mails, which reflect the nature of the work he was performing and the progress of his work. (*See* S.J. Ex. 10 at Friedman/National Indemnity 00249-00250, 00419, 00327, 00538-00539). Any claim by Friedman that Halloran or Chirhart did not know what Friedman was doing is belied by the frequent meetings with Halloran and, later, Chirhart and Friedman's own internal communications while working at National Indemnity. (*See id.*).

d.    <i>Employees cannot re-characterize their duties to avoid<br>application of the exemption</i>.

Courts routinely reject employees' attempts to re-cast their duties to avoid application of the computer employee exemption. *Grills*, 88 F. Supp. 3d at 828-832

(rejecting the plaintiff's claim that the "vast majority of his work time is spent acting as a help desk troubleshooter" because the plaintiff's work duties included handling complex cases and the plaintiff used his discretion as to how to troubleshoot issues and recommend solutions); *Campbell*, 55 F. Supp. 3d at 829-30 (rejecting the plaintiff's effort to recast his role as one resembling a lower-skilled employee where his deposition testimony describes work which carried significant responsibility); *Ortega*, 2016 U.S. Dist. LEXIS 52867, at *38-39 (rejecting the plaintiff's attempt to "escape from application of the computer employee exemption" "through his attorney's unsupported descriptions and re-characterizations of his heretofore admitted primary duties").

Through his discovery responses, Rule 26(f) report, and deposition, it is clear Friedman is now attempting to re-cast his work as menial and routine, particularly with respect to laying cable, installing switches and moving devices from the Midtown Campus to 1314 Douglas. It appears Friedman believes performing some physical duties means he cannot be classified as an exempt employee.  Neither the law nor the facts support this position.

Friedman was one of a handful of people involved in moving devices from the Midtown Campus to the Data Center. (Halloran Depo. 24:13-20). However, when Friedman moved equipment from the Midtown Campus to 1314 Douglas, this was for the purpose of integrating the equipment into a larger work product Friedman was architecting. (Halloran Depo. 53:22-54:1). Because the work of moving devices was "directly and closely related" to the performance of Friedman's exempt network, storage, and Data Center responsibilities, this is also considered exempt work. 29 C.F.R. § 541.702 (work that is "directly and closely related" to the performance of exempt work includes tasks related to exempt duties that contribute to or facilitate performance of exempt work and may include physical tasks and menial tasks that arise out of exempt duties).

The structure and timing of moving devices had to be done carefully, so as to not disrupt business activities, and even Friedman testified that most of the work moving devices to 1314 Douglas required expertise and could not be assigned to individuals without that expertise:

> [T]o say that when I'm running cable or moving servers or doing those
> things is work that you could go hire manpower people to come in and do,

that's not true. **You can't just augment staff, even at this level, with just anybody. They have to know how to do it.**

(Plf. Depo. 191:9-14) (emphasis added). (*See also* Plf. Depo. 157:23-25; 158:23-159:5; Chirhart Depo. 52:22-53:3). Because it would not be practicable to delegate such work to a non-exempt employee, it is clear that this constitutes exempt work. *See* 29 C.F.R. § 541.707. This is true both in terms of the timing and nature of the work.

Friedman's attempt to re-cast his work as menial is consistent with a pattern of behavior in which Friedman describes his work in the manner suited to his purpose at the time. (*See*, *e.g.*, Plf. Depo. 172:12-17). During his divorce proceedings, Friedman "proudly testified that he was one of the few people in the country who was a 'Platinum Certified' Microsoft software technician. He stated he was a computer systems architect, doing 'very skilled work.'" (S.J. Ex. 16, Colorado Order). Consistent with that caliber of skill, near the beginning of this lawsuit, Friedman described his work at National Indemnity on his LinkedIn page as follows:

> Successfully completed Multi Million Dollar on-premises data center. All technical aspects of project including migration. Successfully designed, built and implemented new collapsed L3 7504 Arista Core (15Tbps Wire Speed Non-Blocking with 48 MPX/MPO 120Gb fiber uplinks), new F5 Viprion edge including AFM, LTM, GTM, APM and SWG, new L2/L3 Cisco access switch fabric (110 new 3850/2960 switches), new TinTri Hypervisor Storage cluster, new EMC VNX5800 (240Gb Ethernet attached/removed all FC-FCOE dependencies), new Avamar/Data Domain cluster, new OM4 fiber backbone on 10 floors of new building (480 strands), new 1Gb and 10Gb DWDM fiber uplinks to remote sites, and remote Data Centers, implemented 7 rows of fiber attached Network, Storage and Compute in new data center.

(S.J. Ex. 7, LinkedIn Page).[14]

---

[14] Incredibly, Friedman claimed during his deposition that he "[did not] know what [counsel mean[t] by a 'LinkedIn page,'" and he did not know whether the printout shown to him by counsel was his LinkedIn page. (Plf. Depo. 64:7-8; 65:10-12; 66:17-19). However, Friedman admitted he has a LinkedIn account and that the photograph on the LinkedIn printout was a photograph of Friedman and his son. (Plf. Depo. 64:3-6, 19-22). Moreover, the information on the LinkedIn printout NICO's counsel showed Friedman during his deposition was identical to the information on the LinkedIn printout produced by Plaintiff. (*Compare* Plf. Depo.63:22-66:22 & Depo. Ex. 1 *with* S.J. Ex. 7, BRF00153-00157). Friedman attempted to downplay these similarities by claiming he did not know whether he had produced a copy of his LinkedIn page, and he did not remember writing certain content in his LinkedIn page. (Plf. Depo. 88:13-20; 89:2-10; 67:19-68:8). However, Plaintiff's counsel produced a LinkedIn printout Bates stamped as BRF00153-00157 on March 13, 2017. (Ex. 1, Barrett Aff. ¶8; S.J. Ex. 7). Friedman admitted that he worked at National Indemnity, Lineage Logistics, and Solutionary and attended the University of Nebraska-Lincoln, as indicated on the printout from his LinkedIn account. (Plf. Depo.  65:20-66:11; S.J. Ex. 7).

During his deposition, Friedman made an about-face and attempted to downplay his skills and his duties at National Indemnity by distancing himself from the description of his duties on his LinkedIn. (Plf. Depo. 69:1-70:15). However, contrary to his attempt to re-characterize his duties, Friedman admitted he "participated in things at National Indemnity that involved many of [the] technologies" listed in his LinkedIn page. (Plf. Depo. 69:1-70:15).[15]

Friedman's belated attempts to re-characterize his job duties and communications during his employment at National Indemnity do not change the undisputed facts. In pre-litigation documents and in his own testimony, Plaintiff admitted that he performed skilled work requiring sophisticated network, storage, and server skills. *See Clarke*, 2010 U.S. Dist. LEXIS 33264, *53-54, 59-60 (plaintiff's testimony and pre-litigation documents showed the plaintiff fell squarely within the computer employee exemption). Due to the nature and scope of Friedman's responsibilities, Friedman needed and was granted Domain Administrator Rights, which is the highest level of permissions in the Windows environment and allowed Friedman to effectively access all technology-based resources in the Company. (Halloran Aff. ¶20). It is incredible to argue that this type of broad permission and access to the technology systems of a multi-billion dollar company would be entrusted to an individual who performed only routine and menial tasks. (S.J. Ex. 11, Rainwater Aff. ¶3).

Friedman consistently described himself as a Senior Network/Systems Engineer. (S.J. Ex. 10 at Friedman/National Indemnity 00250, 00328, 00397, 00418-00422, 00511-00512, 00518, 00539, 00576-00577, 00647-00648). Friedman described himself as "a hands-on, non-managerial technical asset of NICO" who was "mostly responsible for the design, configuration and implementation of our network, storage, and datacenter infrastructure" and addressed "significant portions of the server/utilization and directory infrastructure." (S.J. Ex. 10 at Friedman/National Indemnity 000652; Friedman/National Indemnity 000657). Friedman worked with vendors to "address enterprise wide solutions, offerings, and design goals." (S.J. Ex. 10 at Friedman/National Indemnity

---

[15] Plaintiff also claimed he had never seen a copy of his resume submitted to National Indemnity and would admit only that the resume produced by National Indemnity "could be the resume [he] had." (Plf. Depo. 89:11-21; 90:7-18). Plaintiff also denied he engaged in certain e-mail communications because he "can't attest to their chain of custody, their creation, or their validity," but he had no evidence they had been altered in any way.  (Plf. Depo. 170:25-171:16).

00646-00647). He worked on "imperative and crucial part[s] of [National Indemnity's] infrastructure" that required service after hours so as not to disrupt business.  (S.J. Ex. 10 at Friedman/National Indemnity 00397). He was "very effective at managing a significant number of highly technical and extraordinarily difficult tasks." (S.J. Ex. 10 at Friedman/National Indemnity 00510).

Friedman's pre-litigation communications also reflect the sophisticated nature of his work:

- "As you can see the topology holds fine and across multiple L2 hops, trunks, and re-routes the 3024_Main_RACK switch tells the best story, it is mismatched as you can see, it is fine and the last ping to Google DNS actually converges from 3024 to 2962 to 1314 and back to 3024 and out COX in 3024 in this case and that return traffic from Google DNS does the EXACT same loop." (S.J. Ex. 10 at Friedman/National Indemnity 000327).

- "…[T]here were periods of days where Sophos was disabled and attempting to update itself filling the log files with attempt after attempt of failed updates, service starts and failures. RPC, VMI, and Kerberos were also affected. DNS, NETBios, MTU, TCP/IP Queue, and interrupts were changed as a result.  … I am concerned that he is able to log into Domain Controllers, apply GPO's to Domain Controllers, apply GPO's to OU's specifically blocking GPO's and deeply impact core infrastructure without any collaboration or involvement of the engineers charged with the infrastructure he has affected.  **WSUS and Windows Updates are complex and have significant risk of affecting core infrastructure when done incorrectly**…."." (S.J. Ex. 10 at Friedman/National Indemnity 000249) (emphasis added).

- "I have remediated as much as I can tonight, DFS is still not 100%, there are inconsistencies I haven't figured out yet." (S.J. Ex. 10 at Friedman/National Indemnity 000250).

- "[A]fter some more adjustments, including re-prioritizing the services in the Image Right App Server and ICON servers from normal to realtime, stopping all Sophos services, stopping Avamar services, managing

network optimizations such as MTU size, Queue depth, interrupt buffers and size, installing failed and necessary critical, important and system patches, and properly managing MPIO I achieved a 173% improvement of file transfer rates over the NicoIR20 server coping to Tier 1 storage (TinTri) with the NicoIR01 server writing to Tier 3 storage on the VNX." (S.J. Ex. 10 at Friedman/National Indemnity 00419).

- "The root cause of the issue is that we do not have backups today of our Guest OS's on Hyper-V. I am very concerned about this. Then the next issue is we have successive failures in well-thought out, well-funded and highly resilient systems. I am also very concerned about this. … I was doing work that I am well-qualified for, highly experienced with and well within the current standards of change-control." (S.J. Ex. 10 at Friedman/National Indemnity 00538).

Friedman's communications during his employment indicate he felt "ultimately responsible for nearly everything in [National Indemnity's] infrastructure." (S.J. Ex. 10 at Friedman/National Indemnity 00539). Notwithstanding Plaintiff's transparent attempts to re-characterize his job duties as menial, the undisputed facts reflect that Plaintiff sent communications during his employment that confirm the exempt nature of his work, and which is further supported by the access granted to Plaintiff in order to complete this work.  (Halloran Aff. ¶20).

Plaintiff's attempt to characterize his work as menial and routine is also belied by his request for a promotion and raise near the end of his employment. (S.J. Ex. 10 at Friedman/National Indemnity 00291-00293). Friedman believed the nature of his work, results, and the value he added to the Company "spoke for itself."  (Plf. Depo. 162:12-14). He highlighted the "the disparity of skills" Friedman believed he had "day-to-day, demonstrated versus those demonstrated by [his] peers." (Plf. Depo. 194:11-21; S.J. Ex. 10 Friedman/National Indemnity 00292). If, as Plaintiff now claims, his work was menial and routine, such work would not warrant a promotion or raise, nor would it lend itself to the claim that his "skills, knowledge, ability, and training" were greater than his peers at National Indemnity. (S.J. Ex. 10 Friedman/National Indemnity 00292).

The undisputed facts demonstrate that Friedman's primary duty was the performance of exempt work and Friedman is exempt from overtime under the computer

employee exemption. Friedman identified, recommended, and implemented new technologies for the Company's network and storage systems and Data Center, and he participated in resolving high-level outage issues affecting all uses. As such, Friedman falls squarely within the computer employee exemption.

3.   Friedman Was Also Exempt from Overtime Under the Administrative Exemption.

a.   *Standards for Administrative Exemption*.

Under the FLSA's administrative exemption, an employee is exempt from overtime if he is employed in a bona fide administrative capacity. 29 U.S.C. § 213(a)(1). An employee is "employed in a bona fide administrative capacity" if he is compensated on a salary basis at not less than $455 per week[16] and his primary duty includes (a) the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (b) the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200.

"Directly related to the management or general business operations" means work directly related to assisting with the running or servicing of the business. 29 C.F.R. § 541.201(a). Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as computer network, internet and database administration. 29 C.F.R. § 541.201(b). In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. 29 C.F.R. § 541.202(a). The term "matters of significance" refers to the level of importance or consequence of the work performed. Id. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include:

- Whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;

- Whether the employee carries out major assignments in conducting the operations of the business;

---

[16] As set forth above, Friedman was paid on a salary basis of approximately $95,000.00 per year.

- Whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

- Whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

- Whether the employee provides consultation or expert advice to management;

- Whether the employee is involved in planning long- or short-term business objectives; and

- Whether the employee investigates and resolves matters of significance on behalf of management.

29 C.F.R. § 541.202(b). Employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. 29 C.F.R. § 541.202(c). Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. Id. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. Id. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. Id.

> b. *Friedman's Primary Duty Was the Performance of Non-manual Work Directly Related National Indemnity's General Business Operations*.

The first "duties" prong of the administrative exemption examines the "type of work" performed by the employee. *See* 29 C.F.R. § 541.201(a). Under the regulations, "work directly related to management or general business operations" specifically includes, but is not limited to, "computer network, internet and database administration." 29 C.F.R. § 541.201(b).

Friedman performed non-manual work directly related to National Indemnity's business operations because he was responsible for researching and recommending technologies and solutions to meet the requirements of the Company's Data Center. (Halloran Depo. 37:12-16; 73:10-15). He also had responsibility for the Company's network and storage technologies. (Chirhart Depo. 73:10-22; S.J. Ex. 10 at

Friedman/National Indemnity 000652; Friedman/National Indemnity 000657). He worked on technologies that were a "crucial part of [National Indemnity's] infrastructure." (S.J. Ex. 10 at Friedman/National Indemnity 00397). This work falls well within the type of work "directly related to management or general business operations" under the regulations. 29 C.F.R. § 541.201(b).

When Friedman engaged in troubleshooting, he conducted tests and analyzed the results to determine the root cause of high-level network issues. (Halloran Aff. ¶¶33-34, 36). In repairing issues, he did not make manual repairs but rather performed programming and drafted configurations to implement the necessary solutions. (Chirhart Depo. 122:2-10; see also S.J. Ex. 13, Job Description, p. 2 (physical work anticipated was minimal)). Before making recommendations, Friedman researched technologies and communicated with vendors. (Halloran Aff. ¶¶22-23; S.J. Ex. 10 at Friedman/National Indemnity 000652; Friedman/National Indemnity 000657; 00646-00647). This did not require manual work.

As shown in the discussion above, any manual work performed by Friedman in moving devices and installing them in the new Data Center was directly and closely related to his exempt work and does not prevent him from qualifying for the exemptions. *See* discussion, *infra*, section VI.C.2.c.

        *c.*    *Friedman Exercised Discretion and Independent Judgment with Respect to Matters of Significance.*

Friedman also exercised discretion and independent judgment in his work, and his work involved matters of significance to the Company's business. Friedman generally worked independently to meet the objectives outlined by his supervisors and with limited supervision. (Halloran Depo. 29:4-6; 33:6-16). The high-level nature and scope of Friedman's responsibilities required that he be granted Domain Administrator Rights, which is the highest level of permissions in the Windows environment. (Halloran Aff. ¶20). This allowed Friedman to effectively access **all** technology-based resources in the Company. (Halloran Aff. ¶20). Such broad access confirms the significance of the matters on which Friedman worked and the significance of his role within the Company.

Friedman was expected to assist in troubleshooting issues that were "super complex or super painful." (Plf. Depo. 203:9-12). The problems Friedman was expected to troubleshoot were not problems with individual computers, but were generally larger

network or storage problems that affected all users and could have a significant impact on the business. (Chirhart Depo. 70:11-19; 122:11-16). Friedman was expected to use his discretion and independent judgment to determine what test(s) to run to analyze the issue and then analyze the results of the test(s) to try to determine the root cause of the issue as well as come up with solutions to resolve the issue. (Halloran Aff. ¶36).

Friedman also independently researched alternatives in hardware and software to meet the requirements of the Data Center and the Company's network and storage needs. (Halloran Aff. ¶¶21-22; Halloran Depo. 19:7-10; 34:14-19; S.J. Ex. 10 at Friedman/National Indemnity 000652; Friedman/National Indemnity 000657; 00646-00647). Friedman analyzed which vendors and products properly matched the Company's requirements at a reasonable cost and made recommendations to the IT Director based on his analysis. (Halloran Depo. 37:12-16; 73:10-15). The fact that Halloran made the final decision regarding whether to accept Friedman's recommendations does not mean that Friedman was not exercising discretion and independent judgment or that he non-exempt. 29 C.F.R. § 541.202(c). It is clear under the regulations that employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. 29 C.F.R. § 541.202(c). In fact, Halloran accepted many of Friedman's recommendations. (Halloran Aff. ¶¶24-28).

Friedman also performed sophisticated work on systems that were essential to the Company's work, including the Data Center, backup strategies, and network infrastructure. For instance, when the Company was having trouble moving data from ImageRight to storage, Friedman assisted in finding a solution. (Ex. 5 & 15, Recording and Transcript, p. 57 and 1:03:23, p. 90 and 1:40:48; S.J. Ex. 10 at Friedman/National Indemnity 00419; *see* Plf. Depo. 70:16-19). Because the Company's insurance policy and claims files are located in ImageRight, it is imperative that they be able to be stored properly. (Halloran Aff. ¶37). That the systems on which Friedman worked were important to the Company's business is evident from the fact that some of Friedman's work had to be completed after hours so as not to disrupt the business. (*See* S.J. Ex. 10 at Friedman/National Indemnity 00397 ("As this is imperative and crucial part of our infrastructure, we have elected to address the fail-over testing and validation tomorrow night")).

The undisputed facts demonstrate that Friedman was properly classified as exempt under the administrative exemption. He felt "ultimately responsible for nearly everything in [NICO's] infrastructure" and the matters he worked on were "crucial" to the Company's IT infrastructure and its multi-billion dollar business operations. (S.J. Ex. 10 at Friedman/National Indemnity 00397; 00539). He worked with limited supervision and no one had to tell him how to do his job. (Halloran Depo. 29:4-6; 33:6-16). Friedman played an essential role in architecting and engineering the Company's Data Center. These duties fall well within the administrative exemption such that it is clear Friedman was exempt from overtime under the FLSA.

3. <u>Friedman Was Exempt from Overtime Under the Combination Exemptions</u>.

a. *Standards for Combination Exemptions*.

The FLSA regulations also provide for "combination exemptions," under which an employee's exempt duties under one of the exemptions may be combined with exempt duties under another of those exemptions to qualify the employee for exempt status, even where the employee's duties would not meet the primary duty requirements under any single exemption. *See* 29 C.F.R. § 541.708. Thus, an employee whose exempt work under both the administrative and computer employee exemptions, when combined, constitutes his or her overall "primary duty," may qualify for the exemption. As the U.S. Secretary of Labor has explained, "an employee performing duties that fall under more than one individual exemption . . . may be exempt if those duties, when combined, constitute [his] primary duty." *See IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007) (citing Brief for U.S. Dep't of Labor as Amicus Curiae at 4-5). In other words, as the *IntraComm* court explained, the combination exemption provides a mechanism for "cobbling together different exempt duties for purposes of meeting the primary-duty test." *See Intracomm, Inc.,* 492 F.3d at 294; *see also Int'l Assoc. of Firefighters, Alexandria Local 2141 v. City of Alexandria*, 720 F. Supp. 1230, 1232-34 (E.D. Va. 1989) (finding individuals whose work consisted in part of exempt administrative duties and exempt executive duties – neither one of which alone was a primary duty, but which taken together formed their primary duty – qualified for the combination exemption).

b. *Friedman Was Exempt Under the Combination Exemptions*.

43

To the extent the Court finds that any of Friedman's computer exempt duties such as analyzing, testing, and configuring computer network systems do not constitute his primary duty, those duties, taken together with Friedman's exercise of discretion and independent judgment in making recommendations and determining how to resolve the Company's critical networking and storage issues, constitute Friedman's primary duty such that Friedman is properly classified as exempt under the FLSA's combination exemptions. Essentially all of the work Friedman performs is exempt under the computer employee or administrative exemption, or both. Thus, if the Court finds Friedman was not properly classified as exempt under the computer employee or the administrative exemptions, it should still find, based on his combined exempt duties, that Freidman was properly classified as exempt from the overtime requirements of the FLSA.

## V.    CONCLUSION

For the above and foregoing reasons, Defendant National Indemnity Company respectfully requests the Court grant its Motion for Partial Summary Judgment dismissing  Plaintiff's FLSA overtime claim.

DATED this 15th day of September, 2017.

NATIONAL INDEMNITY COMPANY,
Defendant.


BY:    _Patrick J. Barrett_____
Patrick J. Barrett, #17246
Sarah L. (Sally) McGill, #24790
FRASER STRYKER PC LLO
500 Energy Plaza
409 South 17th Street
Omaha, NE 68102-2663
(402) 341-6000
pbarrett@fraserstryker.com
smcgill@fraserstryker.com
ATTORNEYS FOR DEFENDANT

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed with the Clerk of Court for the United States District Court for the District of Nebraska using the CM/ECF system this 15th day of September, 2017, which system sent notification of such filing to the following counsel of record:

> Terry A. White
> Carlson & Burnett
> 17525 Arbor Street
> Omaha, NE 68130

*Patrick J. Barrett*

1740140.04